NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0013n.06

Case No. 23-1508

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Jan 13, 2025<br>KELLY L. STEPHENS, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| ROBERT TREMAINE JACKSON, | ) | |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

Before: McKEAGUE, KETHLEDGE, and NALBANDIAN, Circuit Judges

**NALBANDIAN, Circuit Judge.** Given his previous felony convictions, Robert Tremaine Jackson could not legally possess a firearm. But when the Lansing Police impounded and searched Jackson's car during a traffic stop, they found a gun in the backseat. For this, Jackson was indicted as a felon in possession.

Jackson challenged the search under the Fourth Amendment. But the district court denied his motion, leading Jackson to enter a conditional guilty plea that reserved his ability to appeal the search ruling. Because of his prior felonies, the district court designated Jackson an armed career criminal under 18 U.S.C. § 924(e) and sentenced him to the statutory minimum of fifteen years' imprisonment. Jackson now appeals both the denial of his motion to suppress and his classification as an armed career criminal. Finding neither challenge persuasive, we affirm.

# I.

On July 24, 2021, members of the Lansing Police Department pulled over Robert Tremaine Jackson for driving an uninsured vehicle that belonged to his girlfriend. Upon questioning, Jackson revealed that he did not possess a valid driver's license. Since both actions violated Michigan law, the officers arrested him. This left the question of what to do with the vehicle.

Normally, the Lansing police impound the cars of arrestees. And here, Jackson had pulled over in the driveway of the local Ronald McDonald House. Because the vehicle was uninsured, the police couldn't drive and repark it to clear the driveway. Nor could they return it Jackson's girlfriend, who didn't arrive on the scene until thirty minutes later. So the officers impounded the car. They called a tow truck and conducted the required inventory search of the vehicle.

During the search, Officer Waldrop encountered an opaque plastic bag on the backseat. After scrutinizing the exterior, the officer pulled back the opening of the bag and cast a flashlight beam inside. Inside he discovered a semi-automatic handgun. Jackson later admitted that the firearm belonged to him.

A grand jury indicted Jackson for knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(1). The grand jury also charged Jackson with violating 18 U.S.C. § 924(e) due to his three prior state convictions. Jackson moved to suppress the firearm on several grounds, including that the inventory search was not constitutionally sufficient. After considering the motion, the district court determined that the officers adhered to the inventory-search policy from the Lansing Police Department Manual. The court found that the policy provided sufficient guidance to make the search reasonable under the Fourth Amendment.

After the hearing, Jackson moved to dismiss his attorney and the district court appointed new counsel. With his new counsel, Jackson then moved to reconsider the district court's

suppression ruling. In a memorandum supporting the motion, Jackson challenged the validity of the search because (1) the officers violated the Lansing Police Department's policy for inventory searches and (2) the policy failed to provide sufficient guidance to meet constitutional requirements. In response, the government declared that Jackson's arguments either lacked support in the record or amounted to "a repackaging" of arguments that the district court had already "considered and rejected." R.60, Resp., p.2, PageID 253. Agreeing, the district court denied Jackson's motion for reconsideration.

Having failed to exclude the handgun, Jackson cut a deal. He entered a conditional guilty plea that retained his right to appeal the suppression ruling. The presentence report determined that Jackson's three prior convictions classified him as an armed career criminal. Jackson objected on the grounds that his 2005 state cocaine-trafficking conviction did not meet the statutory definition of a serious drug offense. At sentencing, the district court found that Jackson's prior conviction was a serious drug offense for the purposes of § 924(e). So the district court sentenced Jackson to fifteen years' incarceration, the mandatory minimum under the statute. Jackson now appeals both the suppression ruling and the district court's holding that his state cocaine-trafficking conviction qualified as a serious drug offense.

## II.

When evaluating the denial of a motion to suppress, we review factual findings for clear error and legal conclusions de novo. *See United States v. Ursery*, 109 F.3d 1129, 1132 (6th Cir. 1997).[1] A factual finding qualifies as clearly erroneous only when it leaves the reviewing court

---

[1] The government maintains that we should review only for plain error given that Jackson did not make this argument until his motion for reconsideration of the motion to suppress. And we have said, at least in some contexts, that making an argument for the first time in a motion for reconsideration does not preserve the issue for appellate review. *See Evanston Ins.Co. v. Cogswell*

with "the definite and firm conviction" that the district court was mistaken. *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). And we view the evidence "in the light most likely to support the district court's decision." *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994) (quoting *United States v. Gomez*, 846 F.2d 557, 560 (9th Cir. 1988)).

On appeal, Jackson makes two arguments for why the inventory search violated the Fourth Amendment. First, he contends that the officers' conduct during impoundment did not conform to the written policy. Second, he maintains that the written policy is itself unconstitutional. Jackson claims that these issues made the inventory search unreasonable and required the district court to suppress the handgun. Upon review, we reject both arguments.

**A.**

The Fourth Amendment protects the right of the people to be free from unreasonable searches and seizures. While the reasonableness of a search is often conflated with the warrant requirement, inventory searches may be reasonable even without a warrant. *Colorado v. Bertine*, 479 U.S. 367, 370–71 (1987). When the police lawfully seize a vehicle, they may conduct a "protective inventory" of its contents. *South Dakota v. Opperman*, 428 U.S. 364, 374–75 (1976). This practice serves three purposes: (1) to protect property in police custody, (2) to protect the police against false claims of loss or damage by the owner, and (3) to protect the police from any danger that the contents might pose. *Id.* at 369. An inventory search is reasonable when it has "standardized criteria" or follows an "established routine." *Florida v. Wells*, 495 U.S. 1, 4 (1990).

---

*Props., LLC*, 683 F.3d 684, 692 (6th Cir. 2012). But here, in analyzing the motion for reconsideration, the district court found that it "largely presents the same issues previously ruled upon by this Court." R.61, Mem. Op. & Order, p.1, PageID 259. This was consistent with the government's contemporaneous characterization of the issues as "a repackaging of arguments that [the district court] has already considered and rejected." R.60, Resp., p.2, PageID 253. Jackson's court-appointed counsel had also changed in the interim. So we decline to apply plain error here.

This prevents the search from becoming a "ruse for a general rummaging in order to discover incriminating evidence." *Id.*

So officers must adhere to these policies when conducting an inventory search. In this context, officers lack their normal discretion and must adhere to the policy issued by their department or agency. *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012). When the evidence shows that an officer "acted in bad faith or for the sole purpose of investigation," the inventory search is unconstitutional. *United States v. Vite-Espinoza*, 342 F.3d 462, 470 (6th Cir. 2003). But an officer's suspicion that a vehicle contains contraband does not invalidate a good-faith inventory search conducted according to department policy. *United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998). Because no policy can anticipate every possibility, officers may exercise judgment in furthering the purposes behind the inventory search. *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007).

Jackson first maintains that the search was deficient because the officers did not follow the inventory-search policy in the Lansing Police Department Manual. He contends that the policy allows the vehicle owner to arrange towing for their vehicle to avoid impoundment, so an inventory search after impoundment is the exception rather than the rule. In support, Jackson points to the written policy allowing the vehicle owner to "[r]equest for a specific wrecker service" to handle the towing. R.30-1, Manual, p.2, PageID 82. If the policy gives the owner the chance to arrange the transportation of the vehicle, he argues it would eliminate "any justification for a search." Appellant Reply Br. at 5. Thus, Jackson maintains that the policy *required* the officers to give him the chance to find a private towing service before beginning impoundment procedures. This argument founders on two grounds.

5

First, the plain text of the manual does not require that the officer allow a vehicle owner the opportunity to arrange the tow before impounding the vehicle. The manual says that, after a driver's arrest, "the vehicle will be removed by a non-preference tow service" unless legally parked. R.30-1, Manual, p.3, PageID 83. If the vehicle is illegally parked, the manual allows an officer to waive the tow in two circumstances: (1) the "owner/driver consents to have a licensed driver at the scene take possession of the car"; or (2) the owner asks the officers to park the car in a legal spot. *Id*. So the manual presumes that illegally parked vehicles will be towed after the driver is arrested but permits the officer to waive the tow if the car is legally parked.

As the district court determined, the officers followed the manual and exercised appropriate discretion in concluding that waiving the tow was not appropriate. The car was blocking a private driveway and no one could legally drive or repark it due to the lack of insurance. *See United States v. Kelly*, 827 F. App'x 538, 542 (6th Cir. 2020). And the arrest occurred after business hours so the officers could not ask the landowner's permission to leave the car there overnight. Nor could they wait for the car's owner to try to sort out the insurance issue at 10:40pm. So the decision not to waive the tow was appropriate.

Second, Jackson contends that he should have had a chance to call his own tow truck rather than have the police impound the car and search it. But the owner-request provision Jackson invokes does not give an unqualified right to a personal tow after an arrest. The manual says that when the driver is arrested "the vehicle will be removed by a non-preference tow service." R.30-1, Manual, p.3, PageID 83. The only exceptions include when the car is legally parked or the tow can be waived. By contrast, when a traffic crash requires a wrecker, the car owner can "request" a specific wrecker service. *Id.* at p.2, PageID 82. If the owner doesn't express a preference, then

it's also "non-preference tow." *Id.* So under the manual, an arrestee like Jackson couldn't express a tow preference.

Even so, there is no evidence that Jackson or his girlfriend, who did not arrive on the scene for a half hour, ever requested a private tow. And even if they had requested a specific towing company, it wouldn't change the outcome. The mere fact that the owner can state his preference for a towing company does not imply that he can change the destination of a tow. The vehicle's destination is set by the arresting officer and the Department's Communications Center based on the circumstances. Here, the vehicle would still be taken to the impound lot and held in the police department's custody. So the officers would have conducted an inventory search no matter what company collected the car. And the arresting officer did not violate the policy by requesting a non-preference towing company to impound the car.

Taken together, these points support the district court's determination that the officers complied with the inventory-search policy included in the manual.

**B.**

Jackson next contends that the policy itself falls short of the Fourth Amendment's requirements. Although police departments have "wide latitude" to craft their inventory search policies, these procedures must provide guidance to ensure that "the scope of the search does not fall to roadside discretion." *United States v. Alexander*, 954 F.3d 910, 916 (6th Cir. 2020). The policy must be "sufficiently tailored" to produce an inventory rather than granting officers investigative "carte blanche." *United States v. Hockenberry*, 730 F.3d 645, 659 (6th Cir. 2013). Though the policy may be written or unwritten, the evidence must show that it was established at the time of the search rather than a post-hoc rationalization. *Tackett*, 486 F.3d at 233. But a policy

may still leave some limited "measure of flexibility regarding [its] implementation." *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001).

Jackson claims that the Lansing Police Department Manual does not provide sufficient guidance to the officers on when and how to conduct an inventory search. Specifically, he argues that its failure to advise on closed containers rendered it constitutionally insufficient. But Jackson doesn't provide much substance to back up his contention. Generously construed, his argument hinges on the Supreme Court's decision in *Florida v. Wells*, 495 U.S. 1, 4 (1990). That case held that a policy does not satisfy the Fourth Amendment if it fails to provide guidance "with respect to the opening of closed containers" found during an inventory search. *Wells*, 495 U.S. at 4–5.

Here the department's manual states that impounded vehicles "will routinely be inventory searched for the purpose of recording the vehicle's contents." R.30-1, Manual, p.2, PageID 82. Admittedly, this is not what we call a detailed policy. But this court has previously endorsed a policy that did not mention closed containers as constitutionally sufficient because its "reference to articles and property must include closed containers." *United States v. Hill*, No. 88-3825, 1990 WL 208767, at *1, *3 (6th Cir. Dec. 18, 1990). And as noted by our sister circuits, the exact term "closed containers" need not appear if the terms of the written policy "provide[s] sufficient elucidation to satisfy the constitutional requirements for an inventory search of a closed container." *United States v. Thompson*, 29 F.3d 62, 66 (2d Cir. 1994). *Wells* does not declare that any policy lacking these "buzz words" is automatically deficient. *United States v. Wilson*, 938 F.2d 785, 789 (7th Cir. 1991). So a policy "may adequately regulate the opening of closed containers discovered during inventory searches without using the words 'closed container' or other equivalent terms." *United States v. Mundy*, 621 F.3d 283, 290 (3d Cir. 2010).

At any rate, a written policy can be supplemented by the unwritten practices of a police department. And here officer testimony at the suppression hearing outlined a constitutionally sufficient unwritten policy. An officer's testimony on an unwritten "policy of inventorying all personal items and opening containers" meets the Fourth Amendment's requirements because "[w]hether a police department maintains a written policy is not determinative, where testimony establishes the existence and contours of the policy." *Tackett*, 486 F.3d at 233. Officer Zolnai stated that the department's policy required a "complete inventory of valuable items . . . inside of the vehicle." R.52, Mot. to Suppress Hr'g Tr., pp.23–24, PageID 154–55. Similarly, Officer Marckini noted that officers must search for "whatever valuable property might be in the vehicle" to create a complete inventory. *Id.* at p.58, PageID 189. This testimony supplements the written policy's command that the officers "will note valuables in the vehicle in the tow file." R.30-1, Manual, p.3, PageID 83.

Here the policy provides sufficient guidance directing the searching officer to open all containers to catalog the valuables in the car, making it constitutionally sufficient. So Jackson's challenge necessarily fails.

### III.

Jackson next challenges the reasonableness of his sentence. We review sentencing decisions for an abuse of discretion to determine whether the district court's decision was both procedurally and substantively reasonable. *Gall v. United States*, 552 U.S. 38, 51 (2007). But we review both the district court's statutory interpretation and its legal conclusions on predicate offenses de novo. *United States v. Mateen*, 764 F.3d 627, 630 (6th Cir. 2014) (en banc) (per curiam).

Jackson claims that his categorization as an armed career was an error that undermined the reasonableness of his sentence. This argument has variations. First, Jackson asserts that Michigan law's definition of cocaine prohibited more cocaine isomers than were criminalized under federal law. Second, he claims that the federal government's creation of an exception for the cocaine derivative $[^{123}\text{I}]$ioflupane means that the federal and state definitions of cocaine no longer match. On both points, Jackson's arguments are unconvincing.

**A.**

Under § 924(e), a "serious drug offense" includes any "offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(ii). The statute defines "controlled substance" by reference to the federal schedules created under the Controlled Substances Act. *See* 21 U.S.C. § 802(6). When evaluating whether a state conviction qualifies as a serious drug offense, this court generally employs a categorical approach that looks to the elements of the state statute rather than "the particular facts underlying those convictions." *Taylor v. United States*, 495 U.S. 575, 600 (1990). If the state statute is "divisible"—that is, it includes "one or more elements of the offense in the alternative"—the sentencing court must employ the "modified categorical approach." *Descamps v. United States*, 570 U.S. 254, 257 (2013). So the sentencing court must look to the *Shepard* documents—such as the indictment and jury instructions—to determine the elements of the defendant's conviction. *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016) (citing *Shepard v. United States*, 544 U.S. 13, 26 (2005)).

Jackson's claim that his 2005 Michigan cocaine-trafficking conviction is not a predicate offense hinges on a distinction in vocabulary. Jackson's *Shepard* documents reveal only that he

was convicted of trafficking cocaine. Because the exact substance Jackson trafficked is an element of his prior conviction, the state and federal definitions of cocaine must match. The Michigan statutory definition includes "cocaine, its salts, stereoisomers, and salts of stereoisomers when the existence of the salts, stereoisomers, and salts of stereoisomers is possible within the specific chemical designation." Mich. Comp. Laws § 333.7214(a)(iv). While the federal schedule encompasses "cocaine, its salts, optical and geometric isomers, and salts of isomers." 21 U.S.C. § 812, Schedule II(a)(4).

Under Jackson's view, the term "optical and geometric isomers" has a narrower definition than the word "stereoisomers" such that the Michigan statute criminalizes more conduct than federal law. If that were true, the state cocaine-trafficking conviction couldn't qualify as a predicate offense under the modified categorical approach. *See United States v. House*, 872 F.3d 748, 753 (6th Cir. 2017). Yet we already found that this "federal statutory term . . . is coextensive with the Michigan statutory term." *United States v. Wilkes*, 78 F.4th 272, 285 (6th Cir. 2023). Because the federal and state definitions of cocaine match, Jackson's argument fails. [2]

## B.

The next issue involves how the delisting of [$^{123}$I]ioflupane impacts the modified categorical approach. In June 2015, the Drug Enforcement Administration (DEA) proposed decontrolling [$^{123}$I]ioflupane, a radioactive cocaine derivative used in single-photon emission computed tomography brain imaging, since it did "not possess abuse or dependence potential" and did "not meet the requirements for inclusion in any schedule." *See* Schedules of Controlled

---

[2] Recognizing that his claim is barred, Jackson asks us to reconsider this precedent "in light of recent case law from other circuits and from the perspective of notice and the rule of lenity." Appellant Br. at 35. In doing so, he asks for relief that we cannot grant. Even if we were inclined to revisit the issue, this panel cannot unilaterally overturn the prior decision of another panel. *United States v. Lanier*, 201 F.3d 842, 846 (6th Cir. 2000).

Substances: Removal of [¹²³I]Ioflupane From Schedule II of the Controlled Substances Act, 80 Fed. Reg. 31521 (June 3, 2015). Following notice and comment, the DEA issued a final rule delisting [¹²³I]ioflupane. 21 C.F.R. § 1308.12(b)(4)(ii).

Jackson claims that this 2015 exemption of [¹²³I]ioflupane from the federal controlled substances schedules prevents his 2005 state cocaine-trafficking conviction from qualifying as a prior offense. Since Michigan's controlled-substances law makes no similar exemption, he maintains that his state conviction no longer categorically matches the federal crime. But Jackson does not contest that [¹²³I]ioflupane would have been criminalized under both the state and the federal law at the time of his 2005 conviction. Rather, he argues that federal and state definitions of a drug must match at the time of the federal conviction, not when the prior state conviction occurred.

Once again, Jackson's argument is foreclosed by binding precedent. During this appeal, the Supreme Court rejected the argument that the delisting of [¹²³I]ioflupane prevented a pre-2015 state drug-trafficking conviction from qualifying as a predicate offense under § 924(e). *Brown v. United States*, 144 S. Ct. 1195, 1201 (2024). The Court declared "that a state drug conviction counts as an ACCA predicate if it involved a drug on the federal schedules at the time of that offense." *Id.* at 1210. So we look to the federal controlled substance schedules in force at the time of the prior offense, not at the time of federal sentencing. In 2005 the state and federal definitions of cocaine matched, so Jacksons cocaine trafficking conviction qualifies as a predicate offense. Thus, this argument also fails.

## IV.

For these reasons, we AFFIRM.